UNITED STATES of America, Appellee,

v.

Alexander A. ALEXANDRO,
Jr., Appellant.

No. 860, Docket 81–1435.

United States Court of Appeals,
Second Circuit.

Submitted March 4, 1982.

Decided March 18, 1982.

Joel Winograd, New York City, for appellant.

Laura A. Brevetti, Sp. Atty., E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., Thomas P. Puccio, Attorney-in-Charge, Dept. of Justice, Organized Crime Strike Force, E. D. N. Y., Brooklyn, N. Y., of counsel), for appellee.

Before KAUFMAN and PIERCE, Circuit Judges, and HAIGHT, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

Acknowledging that "corruptio optima pessima," [1]—the best men corrupted become the worst—courts have permitted Government agents, in the public interest, to employ artifice to apprehend public servants who abuse the trust invested in them by virtue of their position. The line between lawful subterfuge and excessive Government involvement in violation of the due

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. S. Purchas, *Pilgrims: To the Reader: Of Religion* (1625).

process clause of the Constitution is drawn when the end sought cannot be justified by the means used. Although recognizing that individuals who have been ensnared by the stratagems of Government agents may have a cognizable due process claim, courts have made clear that, because the difficulties in detecting covert crime often warrant secretive investigations, involvement of Government agents must be of the tenor to shock the conscience before a violation of the due process clause will be found. Such instances, given the interests at stake, will be exceedingly rare.[2]

Today we are asked to determine whether such an occasion is presented by an Abscam[3] ploy. Alexander Alexandro, Jr., a criminal investigator with the Immigration and Naturalization Service, constructed an intricate scheme to obtain a green card[4] for an alien at the request of the purported representatives of Abdul Enterprises, Melvin Weinberg and FBI agent Anthony Amoroso. Alexandro carefully devised every facet of the nefarious enterprise and assured the Government agents his expertise was the product of much experience in matters of this kind. The agents merely agreed to Alexandro's proposal and offered remuneration in exchange for his services. Alexandro would have us determine that this scenario demonstrates such outrageous Government conduct that his conviction by a jury of receiving bribes pursuant to 18 U.S.C. § 201(c),[5] conspiracy to receive bribes pursuant to 18 U.S.C. § 371,[6] and conflict of interest pursuant to 18 U.S.C. § 203[7] must be overturned. He further

2. *See Hampton v. United States*, 425 U.S. 484, 495–96 n.7, 96 S.Ct. 1646, 1653 n.7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring).

3. "Abscam" is a form of acronym, derived from the "first two letters of 'Abdul Enterprises Ltd.,' the name given to the fictitious Middle Eastern business that the undercover agents invented for the purposes of the investigation that led to [this indictment] and the word 'scam,' a slang expression, perhaps derived from 'scheme' meaning a confidence game or swindle. Webster's New World Dictionary 1270 (2d college ed. 1978)." *United States v. Myers*, 635 F.2d 932, 934 n.1 (2d Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

4. "Green card" is the term used for the document which indicates aliens have permanent resident status in the United States.

5. 18 U.S.C. § 201 (1976) provides in pertinent part:

(c) Whoever, being a public official . . . directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for:

(1) being influenced in his performance of any official act; or

(2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(3) being induced to do or omit to do any act in violation of his official duty; . . .

\* \* \* \* \* \*

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

6. 18 U.S.C. § 371 (1976) provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

7. 18 U.S.C. § 203 (1976) provides in pertinent part:

(a) Whoever, otherwise than as provided by law for the proper discharge of official duties,· directly or indirectly receives or agrees to receive, or asks, demands, solicits, or seeks, any compensation for any services rendered or to be rendered either by himself or another—

\* \* \* \* \* \*

(2) at a time when he is an officer or employee of the United States in the executive, legislative, or judicial branch of the Government, or in any agency of the United States, including the District of Columbia, in relation to any proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which the United States is a party or has a direct and substantial interest, before any department, agency, courtmartial, officer, or any civil, military, or naval commission, . . .

\* \* \* \* \* \*

Shall be fined not more than $10,000 or imprisoned for not more than two years, or

asserts that his conviction of conflict of interest should be vacated as a lesser included offense of his conviction of bribe receiving. We find his contentions meritless and accordingly affirm the judgment of conviction.

## I.

Beginning in January 1979, as part of the investigation termed "Abscam," FBI agent Anthony Amoroso, using the pseudonym Tony DeVito, and Melvin Weinberg, a paid informant, bore the guises of officers of a fictitious corporation, Abdul Enterprises. Through Amoroso and Weinberg, this company supposedly was a vehicle for investing millions of dollars of the wealth of oil-rich Arab sheiks, Kambir Abdul Rahman and Yassir Habib, in business ventures in the United States. To effect the goals of the investigation, Amoroso and Weinberg would often meet with various individuals at the offices of Abdul Enterprises in Holbrook, Long Island and elsewhere and offer them the opportunity to make whatever business proposals they desired. If illegal schemes were proposed, they were pursued by the FBI.

As part of the portrait of limitless Arab riches, lavish parties were held in Florida aboard the luxurious yacht, the Left Hand. On March 23, 1979, Alfred Carpentier, a Long Island businessman, at the invitation of Melvin Weinberg, attended one such party. During the course of the affair, Carpentier introduced Amoroso and Weinberg to one of his friends, a supposed Count Montforti. Montforti managed to create an occasion to display a diplomatic passport and documents indicating that he was a Knight of Malta. Carpentier then interjected that Amoroso and Weinberg, or even the sheiks, could rise to Knight of Malta

rank with diplomatic status not on merit, but by merely paying $25,000.

Carpentier had more than bogus knighthood to offer. He stated he could provide passports and green cards for aliens by calling upon the services of Alexander A. Alexandro Sr. and Jr., a father and son team who worked for the Immigration and Naturalization Service. Carpentier, eager to generate illegal and lucrative business with the sheiks, offered to arrange a meeting with the Alexandros at any time their offices were desired.

Amoroso and Weinberg reported Carpentier's offer to their FBI supervisor, and the decision was reached to pursue it. They would ask Carpentier to obtain a green card for an Irish alien, Thomas Foley, as a favor to the shiek who was allegedly a friend of Foley's father.[8] Accordingly, on May 30, 1979, Amoroso and Weinberg met with Carpentier and explained that Foley was experiencing difficulty emigrating to the United States. The sheik, they noted, would greatly appreciate assistance in procuring Foley's green card. Carpentier quickly accepted the chance to turn an illegal profit, and named Alexander Alexandro Jr. as the Immigration official who would do the job. The price was normally determined by the alien's wealth and the urgency of his need to enter the United States, Carpentier explained. Although similar operations had cost as much as $100,000, Carpentier believed that Alexandro, whom he stated was "very good," would charge only $10,000. Warming to his topic, Carpentier described some of the steps in Alexandro's procedure of securing green cards for his paying customers.[9] The price Alexandro would charge was quite reasonable, Carpentier noted, when one considered the number of individuals whose necessary services

---

both; and shall be incapable of holding any office of honor, trust, or profit under the United States.

8.  Thomas Foley, whose name was used in this scheme, was actually the relative of FBI agent Good, agent Amoroso's supervisor. Foley had visited the United States briefly several years before from his native Ireland.

9.  Carpentier explained that once Alexandro acquires necessary background information, he obtains the alien's file and then decides which procedure to use to secure a green card. He pointed out that in reaching his conclusion Alexandro consults with co-workers and an immigration attorney whom he has used in the past to represent aliens.

were included in Alexandro's fee. Amoroso gave Carpentier $500 for his introduction to Alexandro and, generally, for his "expenses" in helping to arrange the green card transaction.

The next day Amoroso and Weinberg met with Carpentier, Alexandro, and a friend of Carpentier, at the Colony Hill restaurant in Long Island and recorded the conversation. After Amoroso explained that Foley had been in the country once before on a tourist visa, Alexandro stated he would gain access to the alien's immigration file. From that file he would determine, with the advice of his cohort and attorney, which method would be most suitable for obtaining the green card. Only then could he establish the cost of the transaction. To assure Amoroso and Weinberg of his abilities, he related tales of other services he had performed [10] and, to impress them thoroughly, he boasted he could arrange for heroin to be smuggled into the country without detection.

A series of tape recorded telephone conversations followed the meeting. Amoroso gave Alexandro the alien's name, residence, occupation, and date of birth. Alexandro, in a later conversation, informed Amoroso that he had Foley's immigration file, asked for more background information, and quoted $6,000 as a tentative fee for himself and the lawyer he would use. He then proposed two methods of arranging for the green card. The first method, having a corporation sponsor Foley as an employee, was a possibility, but, after consulting with his lawyer cohort, he grew concerned about whether a suitable company could be found to match Foley's employment experience and still meet immigration regulations.

Creating a fictitious corporation was a possible option. The alternative method would be hiring a willing bride for $1,000 or so and arranging a sham marriage. Amoroso agreed to follow whatever course Alexandro chose and to pay the necessary cost. Alexandro expressed much satisfaction with Amoroso's deference to his expertise and charges.

A few more tape recorded conversations ensued in which information about Foley's background was given, and Alexandro commented on which method of obtaining the green card would be most feasible. Finally, Alexandro informed Amoroso that a contrived marriage was the course of action best suited to Foley's situation. He described his ruse, in which he would personally handle even the smallest detail, including providing Foley with a woman his own age or younger to marry and a place to get blood tests for the marriage certificate. The green card application would be approved without difficulty because "... My main man ... does the inspection" and Foley, through Alexandro's thorough coaching, would know exactly what to say to this carefully selected Immigration inspector.

The weeks Alexandro spent in laying the foundation and devising the intricacies of his web of intrigue culminated in a videotaped meeting [11] with the supposed representatives of the sheiks at the International Hotel at J.F.K. Airport in New York City. With the attention to detail and calm assurance of a businessman presenting a carefully orchestrated corporate transaction to his clients, Alexandro described the artifice he had constructed to ensure Foley permanent resident status.

---

10. For instance, in a tape recorded conversation Alexandro stated that he was the bodyguard of a wealthy businessman on his visits to the United States from Saudi Arabia. As part of this service, he would meet the businessman on his arrival at the airport and personally escort him through customs and immigration checkpoints without inspection.

11. The FBI not only taped conversations with those upon whom the investigation centered but also videotaped the final meeting with Alexandro for the purpose of corroborating the Government's charges. The legality of using this modern electronic device for gathering telling evidence is not challenged. What is claimed is that those who unfortunately had their activities captured by the camera and sound equipment were the subject of such "dirty tricks" that the whole case, indictment and all, must fall. One suspects, however, that it is the impact of the recorded evidence which is really at the core of Alexandro's strategy to raise the due process claim.

Foley would obtain a visitor's visa in Ireland which would permit him to visit the United States. Upon arrival at the airport, Alexandro would meet Foley and escort him to "[a] little GS–5 Inspector" to arrange authorization for a three to six month visit pursuant to the visa. Should a problem arise, Alexandro simply would "go over his [the inspector's] head." During the authorized visit to the United States, Foley would meet a woman hired by Alexandro, a United States citizen, and marry her. The woman was fully willing to cooperate, Alexandro reassured Amoroso: "The broad knows if she opens her mouth she's dead.... Because she's played with the boys already. She knows that she keeps her mouth shut."

Alexandro, in an unlimited spirit of accommodation, provided his clients with all essential services he assured them. He would arrange blood tests at a friend's hospital and procure the marriage certificate. Once the marriage was accomplished, Alexandro would obtain the green card quickly. Although Foley would be interviewed by an Immigration and Naturalization Service examiner, that procedure would, in actuality, be a mere formality. The examiner would be, in Alexandro's words, "my man," and Alexandro would ensure the smooth operation of the scheme by paying off the people "on the inside." Alexandro's attentions did not cease at this point. After a minimum of a year and a half wait, Alexandro, ever cognizant of his client's needs, confidently declared he would arrange Foley's divorce through his own attorney.

The final price for this extensive package of services would be $15,000, which Alexandro noted, no doubt to stress the cost was moderate in light of the complexity of the transaction, included not only his own charge but also the requisite fees of other necessary Immigration employees. Amoroso handed him $2,000 as a downpayment and promised, as Alexandro suggested, to pay him half of the balance of $13,000 in small denominations two weeks before Foley's contrived marriage with the remainder to be delivered at Foley's final interview with the Immigration examiner. In exchange, Alexandro emphasized that the transaction was "guaranteed ... because I've done it before."

After his arrest, Alexandro was indicted on three counts: bribe receiving in violation of 18 U.S.C. § 201(c), conflict of interest in violation of 18 U.S.C. § 203, and conspiracy to receive bribes in violation of 18 U.S.C. § 371.

At trial, which lasted over a week, tape recordings of the telephone conversations and the videotape of the meeting at the J.F.K. Airport hotel were admitted into evidence. Agent Amoroso and Melvin Weinberg and others testified for the Government. At the close of the Government's case, Alexandro moved to dismiss the Government's case, indictment and all. He claimed that the Government's conduct of its undercover investigation had violated his right to due process of law. The trial judge denied the motion.

In what appears from the record to be a flourish of high drama, Alexandro, a veteran criminal investigator for the Immigration and Naturalization Service who had some experience as an undercover agent, took the stand in his own behalf and began to relate the familiar saga of the investigated as the investigator. He testified that Carpentier had contacted him and stated that an Arab organization he represented needed Alexandro's advice about an immigration problem. If Alexandro could assist the shieks, a portion of a $15,000 gratuity would be his. Although he had doubts about the legitimacy of the forthcoming transaction, Alexandro met with Amoroso and Weinberg.

Conceding the accuracy of the tape recordings offered by the Government, Alexandro explained his ostensibly incriminating statements and acts by claiming that he immediately assumed the guise of a corrupt agent to investigate his would-be corruptors. Thus, to further his self-assumed investigative role, he stated he tried to impress Amoroso, whom he believed was a member of organized crime, claiming, *inter alia*, personal influence with the Immigra-

tion and Naturalization Service, suggesting the use of a cooperative woman for a contrived marriage with the illegal alien, and boasting that his father was a bodyguard for the late underworld figure, Carlo Gambino. He asserted he negotiated the cost of the transaction and accepted the $2,000 downpayment for his services merely to ensnare more completely his corruptors.

We should note that Alexandro, despite his experience as a criminal investigator and his familiarity with sanctioned investigative procedures, never reported his alleged self-devised investigation to his supervisors, the FBI, or federal prosecutors. Moreover, he never requested the assistance of other Immigration and Naturalization Service agents. Nor did he try to acquire photographs or fingerprint evidence. Indeed, he never took the time to prepare memoranda of his conversations with Amoroso and Weinberg. The crucial $2,000 "evidence" was unavailable as corroboration of his story, he explained, because his roommate, Anthony D'Angelo, had taken it and spent it without telling him. D'Angelo offered a similar account of the missing money in his testimony. A Government witness, Edward J. Krumholtz, a ten year veteran of the Suffolk County Police Department and Alexandro's friend since childhood, testified, however, that Alexandro admitted to him that he had accepted the money from Amoroso and spent some of it. Alexandro never stated to Krumholtz that D'Angelo had taken the money.[12]

We have recited in substance the case submitted to the jury, including the powerful tape recording evidence. This evidence came under incessant attack because of its pervasive impact on the case before the jury, since what the jury sees and hears from the electronic tape is difficult to refute. After five hours of deliberation, the jury returned a verdict of guilty on all three counts. Alexandro was sentenced to a term of four years in prison and fined $5,000 on the conspiracy count, to a concurrent term of four years in prison and an additional fine of $2,500 on the bribery count, and to a term of three years probation on the conflict of interest count to commence after the aforementioned terms are served. Alexandro appeals.[13]

## II.

Alexandro does not raise the defense of entrapment. Instead, he urges us today to conclude that the involvement of Government agents in his scheme to permit Foley to enter this country illegally was so repugnant and excessive that due process principles should have prohibited his criminal prosecution and that the indictment should now be dismissed.[14] We disagree.

It has been suggested by both the Supreme Court and this Court that Government involvement may become so outrageous in a prosecution that the due process clause of the Constitution would forbid conviction. *See, e.g., Hampton v. United States*, 425 U.S. 484, 491–95, 96 S.Ct. 1646, 1650–1653, 48 L.Ed.2d 113 (1976) (Powell, J. concurring); *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973); *Archer v. Commissioner of Correction*, 646 F.2d 44, 46–47 (2d Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 291,

---

**12.** Alexandro presented other witnesses. For example, Neil Jacobs, Brian Havens, and John MacAlister, fellow criminal investigators at the Immigration and Naturalization Service, Wayne Chalker, a police officer, Russell Porzelt, an accountant, and Frank Acito, a liquor store owner, testified that they knew Alexandro for up to twenty years and, in their opinions, he enjoyed a reputation for truthfulness and honesty. James Rolland, his supervisor through 1977, also testified. In addition, Alexandro offered many letters of recommendation.

**13.** Alexandro's co-defendant, Alfred Carpentier, was convicted of the crimes of conspiracy and conflict of interest but acquitted of bribe receiving. He received a sentence of four years imprisonment and a fine of $5,000 on the conspiracy count and a suspended term of two years in prison and an additional fine of $5,000 on the conflict of interest count.

**14.** *cf. United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982) (reversing district court's order granting motion for judgment of acquittal on a number of grounds including alleged violation of rights under the due process clause in directing the reinstatement of the jury's verdict of guilty).

70 L.Ed.2d 141 (1981); *United States v. Nunez-Rios*, 622 F.2d 1093, 1097–98 (2d Cir. 1980); *United States v. Corcione*, 592 F.2d 111, 114–16 (2d Cir.), *cert. denied*, 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 794 (1979). It is clear to us that this is not such a case. The facts fall far short of indicating conduct that would violate Alexandro's rights pursuant to the due process clause.

The cases that have sustained due process claims concern Government conduct that was most egregious and reached the level of shocking the conscience. There are any number of cases, however, where the claim has been rejected despite the presence of more pervasive Government participation than in this case. In *United States v. Russell, supra*, a Government agent provided a chemical essential to the manufacture of methamphetamine to a group of individuals engaged in illegally producing the compound. The Supreme Court upheld the conviction stating that since predisposition was present there was no entrapment and that Government involvement was not sufficiently extensive to offend the due process clause. In *Hampton v. United States, supra*, the defendant claimed that a Government informant induced him to become involved in a drug transaction and supplied him with drugs. He then sold them to a Government agent, was arrested and convicted of selling heroin. A majority of the Court upheld the conviction. Justice Rehnquist, writing for three members of the Court, concluded that the Government's alleged overinvolvement did not mandate reversal of a conviction. See *Hampton v. United States, supra*, 425 U.S. at 488–90, 96 S.Ct. at 1649. Justice Powell, joined by Justice Blackmun, agreed that excessive interaction was not present in the case, *id.* at 491–92, 96 S.Ct. at 1650, and went on to indicate that the Government's participation would have to be truly egregious to violate due process rights: "I emphasize that the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Id.* at 495–96 n.7, 96 S.Ct. at 1653 n.7.

The Supreme Court has long held that in dealing with alleged violations of the due process clause it will concern itself with the means by which relevant evidence is obtained. *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). Due process decisions have established the general requirement that states in conducting prosecutions must observe the decencies of a civilized society. In *Rochin*, for instance, the Court declared that a conviction must be reversed because it was obtained by methods violative of the due process clause. After Rochin had swallowed two capsules police officers suspected contained illegal drugs, the officers took him to a hospital. His stomach was pumped against his will, causing him to vomit forth the two capsules which were later found to contain morphine.

The Court has also placed limitations on the use of coerced confessions as a means of obtaining evidence. In *Watts v. Indiana*, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801, Watts was arrested and held several days without the aid of counsel or advice concerning his constitutional rights. He was kept in solitary confinement in a cell with no place to sit or sleep except the floor and was interrogated by alternating teams of police officers, usually until long past midnight. After nearly a week of this treatment, he confessed to murder. Justice Frankfurter, writing for the Court, stated that the use at trial of a confession obtained in this manner violated the due process clause. 338 U.S. 49, 52–55, 69 S.Ct. at 1349 (1949). *See* Y. Kamisar, W. LaFave & J. Israel, *Modern Criminal Procedure*, 554–57 (5th ed. 1980). The distinction between these cases and the instant one is clear. There, the challenged conduct ranged from an invasion into the integrity of the body to an extraordinarily coercive interrogation. The activities called into question here, however, merely involve special investigative techniques for obtaining evidence of Alexandro's voluntary participation and do not entail bodily invasion. Moreover, not a scintilla of evidence suggests coercion.

In sum, we find no violation of Alexandro's rights under the due process clause of the Constitution. Indeed, we have refused to dismiss an indictment in similar circumstances despite the presence of purported Government effort to gather evidence which was far more extensive than anything alleged to have occurred in this case. In *Archer v. Commissioner of Correction, supra,* a federal agent posing as an underworld figure was arrested on a weapons charge and then offered to bribe New York City officials in an attempt to uncover suspected corruption in the city's criminal justice system. The scheme required undercover agents to lie to police officials and to commit perjury before judges and grand jurors. *See United States v. Archer,* 486 F.2d 670, 672–74 (2d Cir. 1973) (indictment dismissed on other grounds). Despite these machinations, Judge Friendly, writing for the panel, stated that such conduct did not constitute a denial of rights under the due process clause. *Archer v. Commissioner of Correction, supra,* 646 F.2d at 47. In *United States v. Nunez-Rios, supra,* Henry, a Government informant, had allegedly initiated a cocaine transaction, located a buyer, and supplied the drugs which Nunez-Rios sold to the buyer, a Government agent. Again, we decided that such activities did not rise to the level of outrageous or shocking conduct on the part of those trying to apprehend criminals. 622 F.2d at 1098.

Alexandro, however, asserts he was a dutiful employee of the Immigration and Naturalization Service. He would have us believe that he was selected at random, for no reason whatsoever, to be tempted to commit a crime by Government agents. The facts speak otherwise. Alexandro's own representative, Carpentier, initiated the fraudulent scheme to obtain the green card for Foley. Alexandro himself laid the complex, nefarious plot, negotiated the cost, and defined the details of the transaction— even extending to arranging for a divorce a year and a half after the green card had been obtained. The Government by agreeing to Alexandro's ruse and price "merely afford[ed] opportunities or facilities," *Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932), and the only limit upon such conduct is that the innocent not be trapped, *id.* at 445, 53 S.Ct. at 214. Alexandro, we note, did not and could not assert a defense of entrapment, undoubtedly because of his ready acquiescence. *See, e.g., United States v. Miley,* 513 F.2d 1191, 1202 (2d Cir.), *cert. denied sub nom. Goldstein v. United States,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975); *United States v. Nieves,* 451 F.2d 836, 837–38 (2d Cir. 1971). Moreover, it is utterly unrealistic for Alexandro, a Government employee in a position of trust, to excoriate his employer for approaching him with a corrupt transaction when he was neither coerced nor forced to become involved. He could have firmly and easily said "No." *See United States v. Myers,* 635 F.2d 932, 939 (2d Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980). That simple response would have been the best and clearest retort. Accordingly, the Government participation in this case simply did not rise to a "demonstrable level of outrageousness."

Alexandro's principal reliance on *United States v. Twigg,* 588 F.2d 373 (3d Cir. 1978) is misplaced. *Twigg* is easily distinguished. In *Twigg,* appellants Neville and Twigg contended that a Government informant had initiated the creation of a drug manufacturing laboratory, provided the chemicals and glassware and rented a farmhouse to be used as the laboratory. The informant actually operated the laboratory, although Neville and Twigg assisted him. A divided panel of the Court of Appeals for the Third Circuit decided that the Government's activities had reached a " 'demonstrable level of outrageousness'." *Id.* at 380.[15] In the present case, the Government agents never drew Alexandro into an elaborate, ongoing criminal enterprise as Twigg

---

15. The Third Circuit's reasoning and conclusions in *United States v. Twigg,* 588 F.2d 373 (3d Cir. 1978) have been criticized. *See Comment, Due Process Defense When Government Agents Instigate and Abet Crime,* 76 Geo.L.J. 1455 (1979).

had been.[16] After the initial contact with Carpentier, the agents merely asked Alexandro to provide a green card in exchange for a fee. Alexandro then became the driving and persistent force behind the intricate scheme to bring the alien, Foley, into the United States and to obtain the green card. Clearly, the Government involvement here does not remotely approach the level in *Twigg.* Moreover, we believe that Alexandro's corrupt activities were precisely that type of elusive, difficult to detect, covert crime which may justify Government infiltration and undercover activities.[17]

### III.

■ No more than a brief discussion is necessary to dispose of Alexandro's second claim. In sum, he asserts his conviction of conflict of interest pursuant to 18 U.S.C. § 203 should be vacated as a lesser included offense of his conviction of bribe receiving pursuant to 18 U.S.C. § 201(c). It is well settled that if Congress intended multiple punishments for the same act or transgression, imposition of such sentences is not a constitutional violation. *See Albernaz v. United States,* 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981). Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be employed to determine whether there are two or only one offense is "whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). *See Albernaz v. United States, supra,* 450 U.S. at 339, 101 S.Ct. at 1142 (quoting *Blockburger).* If so, multiple punishment is authorized although there is substantial overlap in proof offered to establish the crimes.

■ 18 U.S.C. § 201(c) (1976) provides:

(c) Whoever, being a public official . . . directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for:

(1) being influenced in his performance of any official act; or

(2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud on the United States; or

(3) being induced to do or omit to do any act in violation of his official duty . . .

.    .    .    .    .

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

18 U.S.C. § 203 provides in pertinent part:

(a) Whoever, otherwise than as provided by law for the proper discharge of official duties, directly or indirectly received or agrees to receive, or asks, demands, solicits, or seeks, any compensa-

---

16. In his brief, Alexandro refers to the lure of immense wealth, luxurious yachts, expensive cars, planes and substantial sums of money. Although these trappings were part of the overall cover story of Abdul Enterprises, the record does not indicate that they had any relevance to Alexandro's case. Indeed, Alexandro was never exposed to any of these accoutrements. He held most of his conversations by telephone, and neither the Long Island restaurant nor the airport hotel where he met with Weinberg and Amoroso could be characterized—even with a roaming imagination—as lavishly opulent. Moreover, in his testimony at trial, Alexandro did not dwell on the agents' connections with Arab riches but rather stated he believed they were members of organized crime perhaps engaged in smuggling diamonds or heroin.

17. The Supreme Court has offered a similar rationale for condoning police involvement much more extensive than is the case here. *See Hampton v. United States, supra,* 425 U.S. at 495–96 n.7, 96 S.Ct. at 1653 n.7 (Powell, J., concurring); *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973).

We take note at this point that the Government, in its brief, argues that Alexandro waived his right to assert the due process defense by failing to raise it in a pretrial motion. We decline to express our views on this contention because our decision obviates the need to reach its merits.

tion for any services rendered or to be rendered either by himself or another—

. . . . .

(2) at a time when he is an officer or employee of the United States in the executive, legislative, or judicial branch of the Government, or in any agency of the United States, including the District of Columbia,

in relation to any proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which the United States is a party or has a direct and substantial interest, before any department, agency, courtmartial, officer, or any civil, military, or naval commission. . . .

. . . . .

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both; and shall be incapable of holding any office of honor, trust, or profit under the United States.

Section 203(a) is clearly not a lesser-included offense of § 201(c), and each "provision" requires proof of a fact which the other does not. Section 203(a) prohibits receipt of compensation "otherwise than as provided by law for the proper discharge of official duties," while § 201(c) requires receipt "corruptly" and in return for being influenced, which are additional elements. Sections 201(c)(1) and (3), in addition, require proof that the money is received in connection with an actual or contemplated official act or duty.[18] It is clear on the face of § 203(a) that it does not require proof that compensation was "corruptly" received or solicited as does § 201(c). This is a critical difference going to intent. Accordingly, each provision requires proof of a fact which the other does not within the meaning of *Blockburger*, and multiple punishments are proper. The Government here presented facts sufficient to satisfy the elements of conflict of interest as well as the different elements of bribery. Thus, Alexandro's conviction on the conflict of interest count need not be vacated.

*En passant*, we note that the Abscam affair has generated a heavy assault upon the FBI's investigative procedures. Abscam indeed was an intricate artifice, a stratagem of convoluted ploys and schemes designed to test the faith of those in the high echelons of Government who are the repositories of the public trust. Given the special relationship between the public and those who serve the Government, it is inevitable that the public will call for, and law enforcement officials will rely upon, special investigative techniques to uncover insidious corruption. Modern crime fighting methods such as videotapes and carefully devised and supervised covert investigations often are the only means of discovering breaches of the fundamental mandate of one's office.

As we have made clear, the end cannot justify the means, and any method of achieving a goal is not necessarily acceptable. At the heart of our democracy rests the precept, woven into the fabric of our law by the Framers of the Constitution, that all individuals are protected from overreaching Government conduct. This time-honored principle has guided our deliberations as we have considered the activities challenged by appellant Alexandro. To summarize what we have concluded, the Government participation in the scheme concocted by Alexandro simply was not sufficiently intrusive to be deemed violative of Alexandro's rights under the due process clause. Indeed, one wonders whether it is Alexandro's recognition of the impact the taped evidence would make which, in actuality, impelled his invoking the due process clause strategy. We find it clear in this case that the means fully vindicated the end—apprehending by lawful means one who showed a willingness to abuse the public trust.

---

**18.** 18 U.S.C. § 201(a) (1976) defines official act as:

any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in his official capacity, or in his place of trust or profit.

Accordingly, we affirm the judgment of conviction.