**UNITED STATES of America, Appellee,**

v.

**Fiorentino ZAMBRANO, Salvatore Cardella, Frank Grappone, Defendants-Appellants.**

**Nos. 1398, 1338, Dockets 85–1036, 85–1052.**

United States Court of Appeals, Second Circuit.

Argued June 26, 1985.

Decided Nov. 14, 1985.

Ronald Gene Wohl, New York City (Philip C. Pinsky, George Skandalis, Ferziger, Wohl, Finkelstein & Rothman, New York City, of counsel), for defendant-appellant Grappone.

Charles Lavine, Forest Hills, N.Y., filed a brief for defendant-appellant Zambrano.

Peter A. Norling, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Mary McGowan Davis, Asst. U.S. Atty., Raymond J. Dearie, U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before KEARSE, CARDAMONE and FRIEDMAN,* Circuit Judges.

CARDAMONE, Circuit Judge:

After a jury trial resulted in their convictions for using and conspiring to use counterfeit credit cards in violation of 15 U.S.C. § 1644(a) (1982), and for wire fraud in violation of 18 U.S.C. § 1343 (1982), two defendants come before us on this appeal.[1] One claims that the evidence was insufficient to support his conviction, and both argue that the government improperly manufactured federal jurisdiction where none otherwise existed. Additionally, both contend that the plain, plastic, unembossed replicas of credit cards, without a name or account number, which defendants are charged with conspiring to counterfeit, could legally be sold by them at the time in question.[2] From this they argue that only when the government's undercover operatives embossed the cards did their otherwise innocent acts become criminal. But after careful scrutiny, it is clear there is less to this argument than meets the eye. Because this and the defendants' other tissue-thin contentions are without merit, we affirm both convictions.

## I FACTS

Defendants Fiorentino Zambrano and Frank Grappone appeal their judgments of conviction from the United States District Court for the Eastern District of New York (Bartels, J.), for conspiracy and a number of other substantive counts charging them either with use of counterfeit credit cards and wire fraud, or with aiding and abetting the commission of these crimes. Each was sentenced to concurrent five-year prison terms. Since sufficiency claims require an analysis of the evidence before the jury, we set forth the facts in some detail.

In July 1983 U.S. Postal Inspectors and members of the Queens County New York District Attorney's staff were investigating a counterfeit credit card operation. The agents confronted two partners of the Steinway Bicycle Store in Queens about their use of counterfeit credit cards, and the partners agreed to cooperate. They named Salvatore Cardella as their source for the cards, agreed to continue buying from him, and allowed the inspectors to monitor all related telephone conversations.

In August and early September the Inspectors supervised the partners' purchase of embossed counterfeit cards from Cardella. Under instructions from the officers, one of the partners suggested to Cardella that the partners emboss the credit cards themselves and deliver them to Cardella's customers. Cardella, who was not interested in continuing to sell counterfeit credit cards, agreed to sell an embossing machine and to provide the partners with unembossed cards. Thus, a counterfeit credit card embossing operation was set up in the

---

* Daniel M. Friedman, United States Circuit Judge for the Federal Circuit, sitting by designation.

1. These two defendants and Salvatore Cardella were indicted with 11 others, all of whom were involved in a massive scheme to distribute thousands of counterfeit credit cards. Cardella filed a notice of appeal, but failed to file a brief, and his appeal was therefore dismissed. Nine of the other defendants pled guilty before trial, one individual's case was dismissed and another is a fugitive.

2. Such conduct was made criminal by passage of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, Chapt. XVI (eff. October 12, 1984).

bicycle shop, and the Inspectors used video-tape recorders to monitor the transactions.

The undercover operatives included the two partners joined later by Inspector Kelly. They bought plain credit cards, embossed them with names and account numbers, and then sold them to customers referred to them by Cardella. Cardella supplied the names and account numbers and took purchase orders for the unembossed cards. Beginning in December, defendant Zambrano delivered the unembossed cards to the bicycle shop. The evidence at trial revealed the following chain of supply for the cards: defendant Zambrano, the deliveryman, brought to the bicycle shop unembossed cards that he obtained from Emilio Miraglia, a middleman, whose source of supply was defendant Frank Grappone, a printer.

In addition to delivering the plain cards, defendant Zambrano asked that some cards be embossed for him. Inspector Kelly agreed to emboss the cards with names and account numbers provided by Zambrano in exchange for credit towards the purchase price of the unembossed cards. Kelly did this four times for Zambrano. Surveillance and wiretaps on Zambrano's and Miraglia's telephones established that, in 1984, Zambrano obtained from Miraglia 100 unembossed cards delivered on January 20, 232 cards delivered on March 21, 100 cards delivered on April 18, and 150 cards ordered on April 19 for delivery the following day.

Several transactions between Miraglia and defendant Grappone provided evidence that Grappone supplied Miraglia with the unembossed cards.

(1) On April 3, 1984 Inspector Kelly ordered 100 unembossed cards from Zambrano. The next day Miraglia told Zambrano, in coded terms, that the order would be ready either that night or the following day. Zambrano later called the bicycle store to say that the delivery would take place the next day. Grappone, who was under surveillance, was seen leaving his Staten Island residence on April 5 and driving to Glen Gardner, New Jersey, to the residence of Roger Goodman. Grappone parked his van outside Goodman's residence for 20 minutes, then returned to New York where he drove to 86th Avenue in Brooklyn. At 10:30 a.m. he met Miraglia. Both Grappone and Miraglia remained in their vehicles and Grappone passed Miraglia two packages. Miraglia immediately called Zambrano and arranged to meet him at noon. Zambrano then called the bicycle shop and arranged to come there at one o'clock. At the agreed time Zambrano came to the bicycle shop and gave Inspector Kelly 100 unembossed cards.

(2) On April 16 Inspector Kelly ordered 50 cards from Zambrano and asked that they be delivered on the 18th. Later that same day Zambrano telephoned Miraglia and ordered 50 cards for delivery on the 18th. Miraglia in turn called Grappone and arranged a meeting in Staten Island for that night. The next day Zambrano delivered the 50 cards that Inspector Kelly had requested.

(3) Inspector Kelly then ordered 150 cards from Zambrano to be delivered on April 20. On April 19, the Inspectors intercepted two telephone conversations between Miraglia and Zambrano in which they discussed plans for a meeting the next day. In the second call Miraglia told Zambrano that he was "still waiting for the call." Several minutes later Miraglia dialed Radio Relay, a paging system, paged Grappone and left his own number as a call-back number. Grappone had just left his printing facility on Long Island and was in his van. Nine minutes after Miraglia's page, Grappone pulled his van off the parkway and called Miraglia, saying that he was "on [his] way to a phone to call you," and—in that and a second telephone call soon afterwards— Grappone and Miraglia arranged to

meet at 12:30 a.m. at a diner in Staten Island. Grappone then went to New Jersey and met with Roger Goodman in the parking lot of a diner. After the meeting, the two parted and the Inspectors followed Grappone back to Staten Island, where they arrested him at a toll plaza. Miraglia was arrested in the parking lot of the diner where his meeting with Grappone was to have taken place.

In Grappone's van the Inspectors found three boxes containing 450 unembossed credit cards. The bank logos on 150 of these cards matched the description of cards ordered by Inspector Kelly the day before. They also found a list of bank identification numbers and the names of the corresponding banks. Grappone had a list in his wallet of encoded names for credit cards, including the ones ordered by Inspector Kelly. During a search of Goodman's home, the Inspectors recovered 21,000 counterfeit credit cards and related items. At Grappone's printing facility on Long Island the Inspectors found partially printed cards and negatives of photographs of embossed cards issued by various banks. These negatives apparently served as prototypes for blank cards. One of the negatives was of an expired Chase Visa card issued to Frank Grappone.

Finally, a laboratory analysis was performed on the materials found at Grappone's plant, on the cards seized at Goodman's residence, on those found in Grappone's van, and on cards that had been delivered to the bicycle shop and kept in inventory during the course of the undercover operation. At trial, the examiner who had performed the analysis stated that virtually all of the cards were made from Grappone's negatives. In particular, all of the recovered Chase Visa cards were made from the negative of Grappone's own Chase Visa card.

## II DISCUSSION

### A. *Grappone's Claim that the Evidence was Insufficient to Find Conspiracy*

Grappone argues that even taking the view most favorable to the government, no

jury could have found beyond a reasonable doubt that he was a member of a conspiracy. This argument has some superficial merit because, at the relevant time, it was not a crime to print, sell, or otherwise distribute unembossed plastic sheets in the form of credit cards. These cards became illegal counterfeits only after unauthorized names and account numbers were embossed on them. Even were he to have printed the unembossed cards, Grappone contends, this did not prove he did anything illegal or had any knowledge of an illegal trade in counterfeit cards. Further, even if the government did prove knowledge, Grappone continues, it did not establish that he joined a conspiracy knowingly and with the requisite intent to participate in it.

#### 1. Applicable Law

A defendant who challenges the sufficiency of the evidence is seldom successful, *United States v. Ferguson,* 758 F.2d 843, 855 (2d Cir.1985), because a jury's verdict must be sustained where there is substantial evidence, "viewed in the light most favorable to the Government" to support it. *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). We recognize that the government in the instant case had to do more than simply establish that Grappone printed the unembossed cards. Nor would it have been enough to prove that Grappone knew that the cards might be used illegally. *United States v. Falcone,* 109 F.2d 579, 581–82 (2d Cir.), *affirmed,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). To be found part of a conspiracy, Grappone must have "in some sense promote[d] their venture himself, [made] it his own, [had] a stake in its outcome." *Id.* at 581. Here the evidence before the jury was sufficient to support a guilty verdict for conspiracy.

In *Direct Sales Co. v. United States,* 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), the Supreme Court held that sufficient evidence existed to convict a defendant of conspiracy to violate the Harrison Narcotic Act. The defendant, a mail-order

wholesale drug corporation, sold a physician unusually large quantities of morphine sulphate, a narcotic. The Court distinguished an earlier case, *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), where the defendants had sold sugar, yeast and other similar commodities to operators of illegal stills:

> The commodities sold [in *Falcone*] were articles of free commerce, sugar, cans, etc. They were not restricted as to sale by order form, registration, or other requirements. When they left the seller's stock and passed to the purchaser's hands, they were not in themselves restricted commodities, incapable of further legal use except by compliance with rigid regulations, such as apply to morphine sulphate. The difference is like that between toy pistols or hunting-rifles and machine guns. All articles of commerce may be put to illegal ends. But all do not have inherently the same susceptibility to harmful and illegal use. Nor, by the same token, do all embody the same capacity, from their very nature, for giving the seller notice the buyer will use them unlawfully.

*Direct Sales*, 319 U.S. at 710, 63 S.Ct. at 1268. The difference in the types of goods sold was critical, according to the Court, not only because it made it certain—or significantly more certain—that the seller knew of the intended illegal use of the goods, but also because it tended to show that the seller, by his sale, intended to "further, promote and cooperate in" the illegal use. *Id.* at 711, 63 S.Ct. at 1269.

It was conceded that not every sale of opiates or similarly restricted goods, even with knowledge that the buyer intends to use them illegally, would support a conspiracy count. *Id.* at 712, 63 S.Ct. at 1269. "[S]ingle or casual transactions, not amounting to a course of business, regular, sustained and prolonged, and involving nothing more on the seller's part than indifference to the buyer's illegal purpose and passive acquiescence in his desire to purchase, for whatever end," would not establish intent to further the illegal ends, and thus would not be sufficient evidence to support a conspiracy count. *Id.* at 712 n. 8, 63 S.Ct. at 1269 n. 8. But, in *Direct Sales* the defendant's actions—including high-pressure sales methods and discounting the prices of narcotics—allowed the triers of fact to infer intent and agreement from knowledge. The Court found informed and interested cooperation, stimulation, and instigation. And a jury was presented with sufficient evidence to conclude that defendant had a "stake in the venture" which, even if not a crucial element, tends to prove the question of intent and agreement necessary to sustain a conspiracy charge. *Id.* at 712–13, 63 S.Ct. at 1269–70.

In *United States v. Rush*, 666 F.2d 10, 11–12 (2d Cir.1981) (per curiam), the evidence was held sufficient to convict a defendant of conspiracy when he loaned money to associates who used it to import marijuana. The loan was fully secured and had a very high interest rate, but we noted that defendant used a "clandestine method devised to protect him from its consequences" and concluded that this action could support the jury's finding that he knew of the "intended illegal use" and that he "intend[ed] to further, promote and cooperate in" the illegal scheme. *Id.* at 12. Similarly, in *United States v. Piampiano*, 271 F.2d 273 (2d Cir.1959), we held that defendant's deviation from his usual business as a vegetable dealer to supply sugar to an illicit distillery in a secretive manner constituted sufficient proof to support a conviction for conspiracy. *Id.* at 274–75. Thus, evidence that a defendant simply supplies goods, innocent in themselves, to someone who intended to use them illegally is not enough to support a conviction for conspiracy. But, if there is something more, some indication that the defendant knew of and intended to further the illegal venture, that he somehow encouraged the illegal use of the goods or had a stake in such use, sufficient evidence has been presented to enable the jury to conclude the defendant had knowledge of and an intent to join in the conspiracy; *see United States v. Orozco-Prada*, 732 F.2d 1076, 1080 (2d Cir.), *cert. denied*, —— U.S. ——,

105 S.Ct. 154, 83 L.Ed.2d 92 (1984) (" 'the knowing supply of a raw material necessary for the commission of a crime by another constitutes aiding and abetting that crime.' ") (quoting *United States v. Perry*, 643 F.2d 38, 44 (2d Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981)).

### 2. Law Applied to the Facts of This Case

■ We turn now to apply these rules to the facts in this case. Grappone concedes that he printed the unembossed credit cards. His printing facility contained all of the tools and paraphernalia necessary to produce the cards as well as some partially printed cards. Additionally, Grappone possessed many of the printed, unembossed cards. No serious dispute is made that Grappone via Miraglia and Zambrano supplied the unembossed cards to the undercover operation on both April 5 and April 18. When Grappone was arrested on April 20, a number of unembossed cards, some of which were plainly destined for the undercover operation, were found in his possession. Moreover, his printing facility contained the prototypes for nearly all of the counterfeit cards recovered during the investigation.

Beyond demonstrating that Grappone had supplied goods to people who intended to use them illegally, the government was required to prove by his actions that Grappone knew of and intended to further the illegal venture. The government contends that the nature of the product that Grappone sold—unembossed fake credit cards—was such that it could only be used for an illegal purpose, and that Grappone would therefore have known that purpose. We cannot agree with that proposition.

It is obviously possible, as Grappone argues, for unembossed cards to be used legally. Grappone could have been supplying them to a bank or for use as a promotional gimmick. Yet, the methods of production and delivery of the cards in this case clearly demonstrate no such benign purpose was intended. It would have been

difficult for the jury to conclude that a reasonable doubt existed as to Grappone's belief that his cards were going to be used by banks. No evidence in the record suggests that he was ever told that he would be making the cards for a bank or that Miraglia ever held himself out to be a legitimate middleman for banks. Even if Miraglia had made such a claim, the absence of any contract or other documentation makes it highly unlikely that Grappone could reasonably have believed it. Further, defendant used previously issued embossed credit cards as prototypes, including one issued to himself. If he thought he was printing cards for banks, he should have expected the banks to provide him with new sample cards. The same applies for Grappone to have believed he was supplying cards for some legitimate promotional or advertising purpose; he would have expected orders and samples.

Finally, Grappone's method of delivery of the unembossed cards provides strong evidence that he was a knowing participant in an illicit arrangement. He conducted business at midnight in parking lots or, on April 5, by passing cards while seated in his van to someone sitting in an adjacent car on a Brooklyn street. Grappone, like Cardella, Zambrano and Miraglia, avoided using his own telephone for illicit discussions related to those transactions. Although the conversations between Grappone and Miraglia were made in a secret code, they indicate that Miraglia made no attempt to hide his illegal purposes from Grappone.

Thus, Grappone's activities supplied ample evidence upon which the jury could find that he knew of the illegal use to which the cards were being put. The virtual exclusion of any possibility that the cards were to be used legally coupled with Grappone's clandestine behavior constituted enough to allow the jury to take the further step from knowledge to intent and agreement. It was certainly reasonable for the jury to conclude that Grappone intended by his activities to "cooperat[e], stimulat[e], instigat[e]" the illegal activity. *Direct Sales*

*Co.*, 319 U.S. at 713, 63 S.Ct. at 1270. This is enough to convict him of conspiracy.

## B. *Grappone's Claim of Insufficient Evidence on the Substantive Counts*

The substantive counts on which Grappone was convicted are based on the fraudulent use of two cards. The first was a Citibank Visa card in the name of David Engel, which was used to purchase merchandise on April 24, 1984; the second was a Citibank Visa card in the name of John S. Barman, which was used to purchase merchandise on April 22, 1984. The record reveals that Engel and Barman authorized neither the purchases nor the use of their cards. Both cards had been among the 100 unembossed cards that Grappone had printed and delivered to Miraglia on April 5. Miraglia had given them to Zambrano who, in turn, sold them to Inspector Kelly. The cards were numbered and kept in the bicycle shop inventory. Later, Zambrano provided account information for Kelly to emboss on the cards, including the Engel and Barman names and account numbers. Kelly sold the two cards back to Zambrano and they were subsequently used to make fraudulent purchases.

■ Grappone argues that the use of the embossed cards was so far removed from any action on his part that, as a matter of law, he cannot be found to have aided and abetted their unlawful use. Further, defendant claims that because he was arrested before the cards were used he cannot be convicted as an aider and abettor. To convict a defendant of aiding and abetting the government must prove (1) commission of the underlying crime, (2) by a person other than the defendant, (3) a voluntary act or omission by the person charged as an aider or abettor, with (4) the specific intent that his act or omission bring about the underlying crime. *United States v. Perry*, 643 F.2d 38, 46 (2d Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981). To prove the existence of (3) and (4), the evidence must demonstrate that the person charged joined the venture, shared in it, and that his efforts contributed towards its success. *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938).

■ Unquestionably, (1) and (2)—that an underlying crime be committed by a person other than the defendant—have been met since the use of a counterfeit credit card is criminal. Here, the principals used the counterfeit cards with fraudulent intent and in accordance with a scheme to defraud. Thus, the elements for the commission of violations of 15 U.S.C. § 1644(a) (1982) and of 18 U.S.C. § 1343 (1982) were satisfied. The third requirement, a voluntary act or omission, is fulfilled by Grappone's printing and delivery of the unembossed cards.

The fourth requirement—that the defendant have the specific intent that his act or omission bring about the underlying crime—is similar, though not identical, to the requirement for finding intent to participate in a conspiracy. *See United States v. Tyler*, 758 F.2d 66, 70–71 (2d Cir.1985). Here the jury had sufficient evidence to find that Grappone knew of the unlawful use to which the cards were to be put. Knowing of that use, he continued to supply cards to Miraglia and Zambrano, and can be found to have intended to aid the counterfeit operation. The operation's purpose was to use the cards unlawfully. If the cards were not to be used or sold unlawfully, no cards would have been purchased from Grappone. From this, one can infer that Grappone intended his cards to be put to this specific use.

This case is unlike *United States v. Gallishaw*, 428 F.2d 760 (2d Cir.1970). There, Gallishaw rented a gun to a party who later used it in a bank robbery. We held that to convict the defendant of aiding and abetting the robbery, the government would have had to show that he knew that a bank was to be robbed; a general suspicion or knowledge that the gun would be used illegally was not enough. *Id.* at 763. There is little question in this case of the kinds of illegal uses to which the cards were to be put. Although Grappone was not involved in embossing the cards or using them fraudulently, he knew of the

criminal purposes planned. It is not necessary that one "know all the details of the criminal venture to be considered a participant in its criminal purpose...." *United States v. DeFiore*, 720 F.2d 757, 763 (2d Cir.1983), *cert. denied, Coppola v. U.S.*, 466 U.S. 906, 104 S.Ct. 1684, 80 L.Ed.2d 158 (1984) (citation omitted). Defendant played an integral role in the success of the criminal venture, and the evidence of his association with Miraglia and participation in the counterfeit scheme to bring about its success suffices to convict him of aiding and abetting the venture.

Grappone's second argument, that he cannot be convicted of aiding and abetting when the underlying offense occurred after his arrest, finds no support in case law. Grappone acted before his arrest. Once a jury is satisfied that the underlying crime was in fact committed, defendant's status at the time of its commission is irrelevant.

## C. *The Defendants' Due Process Claim*

■ Zambrano and Grappone both argue that the government's involvement in the counterfeit credit card operation deprived them of due process. We recognize that there are circumstances where government conduct in its investigation of a crime may be so outrageous as to require reversal of a conviction. *Hampton v. United States*, 425 U.S. 484, 491–95, 96 S.Ct. 1646, 1650–52, 48 L.Ed.2d 113 (1976) (Powell, J. concurring); *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *United States v. Alexandro*, 675 F.2d 34, 39–40 (2d Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982); *Archer v. Commissioner of Correction*, 646 F.2d 44, 46–47 (2d Cir.), *cert. denied*, 454 U.S. 851, 102 S.Ct. 291, 70 L.Ed.2d 141 (1981); *United States v. Nunez-Rios*, 622 F.2d 1093, 1097–98 (2d Cir.1980). To violate a defendant's due process rights, government conduct must be "most egregious and [reach] the level of shocking the conscience." *Alexandro*, 675 F.2d at 40. Only rarely will such a claim be sustained. *See United States v. Roland*, 748 F.2d 1321, 1326 (2d Cir.1984);

*United States v. Duggan*, 743 F.2d 59, 84–85 (2d Cir.1984). This is not such a case.

Defendant Zambrano argues that the government's role in embossing the credit cards "supplied the crucial ingredient and catalyst which made [his] activity unlawful." He asserts that all he did was deliver unembossed cards to the bicycle shop and that, absent government involvement, the cards would never have been embossed and a crime would never have been committed. This mischaracterizes the facts. The Inspectors did not initiate the operation, but merely became part of a continuing counterfeit credit card ring. It was at Zambrano's suggestion that Inspector Kelly began embossing cards for him, and it was Zambrano who supplied the names and account numbers to be embossed. Further, the evidence demonstrated that the bicycle shop operation was not the only outlet for cards provided by Grappone, Miraglia, and Zambrano. Inspector Kelly was told by Zambrano that Kelly was not his only customer. Zambrano boasted that he could get a better price elsewhere for the cards. The search of Grappone's van and Roger Goodman's house uncovered many more unembossed cards than were ordered by the bicycle shop operation. The bicycle shop undercover operation was part of a legitimate investigation; the government's conduct was neither extreme nor outrageous.

## D. *The Claim that the Government Improperly Manufactured Federal Jurisdiction*

■ Zambrano's final argument is that since the sale of unembossed cards was not unlawful at the time of his actions, the government, by embossing the cards, created federal jurisdiction where none would have existed absent its activity. Defendant rests his argument on *United States v. Archer*, 486 F.2d 670 (2d Cir.1973). In *Archer* the government agents, acting in an undercover capacity, staged an arrest and falsely testified to the facts surrounding the arrest before a grand jury. The agents then induced the making of several phone calls across state lines for the sole

purpose of creating federal jurisdiction. The investigation was intended to uncover incidents of bribery, but bribery is not a federal offense unless promoted through the use of a "facility in interstate ... commerce" in violation of the Travel Act, 18 U.S.C. § 1952 (1982). During the telephone calls made or induced by the government agents, the criminal scheme was not discussed. In fact, the federal agents induced most of the calls knowing no one connected with the scheme would be there to receive them.

The embossing of the credit cards by the Inspectors was not, as were the phone calls in *Archer*, tailored "for the precise purpose of transforming a local ... offense into a federal crime." *Id.* at 681. In *Archer* the investigators had no reason to suspect a federal violation. *Id.* at 677. The evidence indicated only a local bribery offense. In the case before us, the production and use of counterfeit credit cards itself violated federal law, and the Inspectors had every reason to suspect, before undercover operation was initiated, that federal law was being violated. Thus, Zambrano's final claim is also without merit.

### III CONCLUSION

Therefore, the judgments of conviction appealed from are affirmed.