UNITED STATES of America, Plaintiff,

v.

Samuel MICELI, Defendant.

No. Cr. 90–57L.

United States District Court,
W.D. New York.

June 28, 1991.

Brian McCarthy, Asst. U.S. Atty., Rochester, N.Y., for plaintiff.

Lawrence J. Andolina, Harris, Beach & Wilcox, Rochester, N.Y., for defendant.

## DECISION AND ORDER

LARIMER, District Judge.

Defendant filed motions to dismiss the indictment and to suppress evidence obtained in violation of the Fourth Amendment. The motions were referred to United States Magistrate Kenneth R. Fisher, pursuant to 28 U.S.C. § 636(b)(1)(B) to conduct a hearing and to issue a report and recommendation. The Magistrate issued a lengthy, thirty-three page Report and Recommendation on November 27, 1990. The Magistrate recommended that the motions be denied.

Defendant duly filed written objections to the Report and Recommendation and the matter is before the Court to review the Magistrate's Report pursuant to 28 U.S.C. § 636(b)(1)(B); and Fed.R.Civ.P. 72(b).

The motions all relate to the conduct of Special Agent Steven Meyerson, an investigator with the Internal Revenue Service (IRS) in Rochester, New York. Defendant claims that because of Meyerson's conduct with his estranged wife, the indictment against him should be dismissed because the conduct was sufficiently outrageous as to constitute a violation of due process. In the alternative, defendant claims that the Court in its supervisory capacity should dismiss the indictment. Defendant also claims that his wife burglarized his office and removed certain documents which she gave to Agent Meyerson. Miceli claims that this "burglary" was orchestrated by Meyerson and therefore any fruits of the illegal "search" must be suppressed under the Fourth Amendment.

■ The Magistrate conducted an evidentiary hearing and he recounts in detail the testimony from the hearing. The testimony need not be recounted here in detail. Much of that testimony is troubling because there can be little doubt that Agent Meyerson acted contrary to IRS policy in the conduct of the investigation. Meyerson's conduct was lacking in several respects. Special Agent Donald M. Cerra, the Group Manager of the IRS Investigation Division, testified that it was not proper and showed poor judgment for an investigator to wine and dine the wife of the target of a criminal investigation. If Mrs. Miceli was truly an "informant," Meyerson failed to follow procedure concerning his contacts with her.

It is clear that Meyerson's social relationship with the wife of the target of a criminal investigation was inappropriate. Although Mrs. Miceli was estranged from her husband at the time, Meyerson's social involvement with the target's spouse during the investigation certainly raises obvious concerns about the impartiality of the investigation and the motives for pursuing criminal charges.

The Magistrate recounts Meyerson's activities with Mrs. Miceli and they are supported in the record. Meyerson himself admitted at the hearing that he had several social contacts with Mrs. Miceli while he was also conducting a criminal investigation concerning her husband.

■ As unseemly as Meyerson's actions were, the question remains whether dismissal of this indictment is warranted. Not every misstep or malfeasance by a law enforcement officer requires suppression of evidence or dismissal of an indictment.

I believe that the Magistrate has correctly analyzed the law concerning the defendant's claim that the conduct of Meyerson was such as to warrant dismissal of the indictment for violation of due process.

I agree with the Magistrate that even if such a defense exists, the conduct here was not so outrageous as to warrant dismissal. First of all, and of great significance is the fact that this conduct was not directed at the defendant himself but at his estranged spouse who was apparently quite willing to cooperate with Agent Meyerson both socially and professionally. Such conduct, directed toward a third-party, can rarely be used by a defendant to claim that he was the victim of impermissible government conduct. The Magistrate correctly concluded that Meyerson's conduct was not so outrageous as to shock the sensibilities of the Court in light of the fact that it was primarily directed toward Mrs. Miceli who willingly cooperated with Meyerson.

The Magistrate correctly noted in his decision (at p. 23–24) that even in cases where the conduct was more egregious (for example, where there was sexual activity with the defendant or target of the investigation), reversal was not required because the conduct was not so outrageous as to require dismissal of the criminal charges. Although Meyerson's conduct should not be condoned, it is not of such a nature as to implicate defendant's due process rights.

■ I also adopt the Magistrate's reasoning in rejecting defendant's claim that under the Court's "supervisory" powers, the indictment should be dismissed, presumably as a sanction for impermissible conduct by a law enforcement officer.

Although there may be instances where the court can utilize its supervisory powers to exclude evidence taken from a defendant, this is not such a case. The court's power to "sanction" the executive branch is very limited especially concerning matters that occur outside of the courthouse. In my view, the Magistrate correctly analyzed the law in this area and I adopt his recommendation that there is no basis here for dismissal of the indictment.

■ The remaining claim relates to an alleged violation of the Fourth Amendment. Defendant claims that Meyerson counseled his wife to burglarize his office and this constitutes an impermissible search without a warrant and that the fruits of that search, documents identified at the hearing as Exhibit 1–11, should be suppressed.

According to Mrs. Miceli, Meyerson did suggest and urge her to break into her husband's office to obtain evidence. She entered the office, removed certain financial information and turned it over to Meyerson at his request. Meyerson denied ever suggesting a burglary or receiving the documents from Mrs. Miceli.

Although there are troubling aspects to this claim, the Magistrate credited Meyerson's testimony that he did not encourage Mrs. Miceli to commit the burglary. Several other IRS agents testified that these disputed exhibits were not in the investigative file until long after Meyerson had left Rochester. They suggested that these exhibits had been obtained from other sources and not Meyerson. I accept the Magistrate's recommendation here, especially concerning the testimony of the other IRS agents concerning the documents.

These documents were not the linchpin of the proof against Miceli. The Magistrate determined that virtually all of the documents could have been—and probably were—obtained from third-parties including the IRS itself, banks and other individuals who dealt with the defendant. Under these circumstances, there is no basis to suppress these exhibits.

## CONCLUSION

I adopt the Magistrate's Report and Recommendation filed November 27, 1990. Defendant's motions to dismiss the indictment and to suppress evidence are denied.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

KENNETH R. FISHER, United States Magistrate Judge.

Defendant moves for an order dismissing the indictment and he moves to suppress evidence allegedly seized from his office on Empire Blvd. Defendant seeks to invoke the court's supervisory powers to dismiss and to suppress. He contends also that the indictment and evidence supporting it was procured in violation of the due process clause because the government, or so he contends, engaged in gross misconduct and bad faith violations of the Internal Revenue Guidelines Manual. In addition, defendant moves to suppress evidence seized in an alleged warrantless search of defendant's office in violation of the Fourth Amendment.

The government consented to an evidentiary hearing, which was held. The parties have subsequently submitted briefs on the motion to dismiss and to suppress. These motions were referred to me by Judge Larimer pursuant to 28 U.S.C. § 636(b)(1)(B). The following is my Report and Recommendation that the motions be denied.

## A. *The Defendant's Version*

Mrs. Donna Miceli testified on behalf of the defendant that she has been married to the defendant for nearly 20 years, and currently resides with him at 457 Bay Meadows Drive in the Town of Webster. She acknowledged several marital difficulties with her husband and that she was separated from him intermittently for some period of time. According to her testimony, Mrs. Miceli would often discuss her marital difficulties with Nancy King, the wife of Gary King, who at that time was the local head of the United States Probation office. During a discussion with Nancy King in late December of 1986, Ms. King suggested that Mrs. Miceli consider Steven Meyerson as a possible companion in a "blind date" arrangement. King told Mrs. Miceli to expect a phone call from Meyerson who, Mrs. Miceli was told, was a government employee.

In early January of 1987, Mrs. Miceli received a call from Meyerson in which he requested her presence at the federal building. Meyerson asked for a formal statement and that with such a statement he could start or begin an investigation. On January 9, 1987, Mrs. Miceli went by prearrangement to the federal building at about 4:45 p.m. Meyerson ushered her into a conference room, and then asked her to make a sworn statement concerning defendant's finances. Mrs. Miceli asked if she should have an attorney present, but Meyerson indicated that he didn't wish an attorney involved. Mrs. Miceli agreed to proceed.

She told Meyerson of defendant's financial dealings during the previous several years. At some point during the exchange, Meyerson procured a tape recorder and another investigator. The investigator, who was not named, "swore her in" and began questioning Mrs. Miceli. After the other investigator finished, Meyerson began questioning Mrs. Miceli while the tape recorder was running. According to Mrs. Miceli, Meyerson stopped the tape recorder on a few occasions and then coached her in the desired manner of answering the questions. In particular, Meyerson told Mrs. Miceli to present her suspicions concerning the defendant as if she knew the underlying circumstances as established fact. Mrs. Miceli described her relationship with her husband as "estranged to say the least," and she described her condition during this interview as distraught and upset.

After the taped interview, Meyerson and Mrs. Miceli went to a State Street Bar, where they consumed a few drinks and appetizers. They talked of their personal lives, their likes, dislikes and future plans. According to Mrs. Miceli, Meyerson told her of the circumstances of his divorce, and she in turn described her situation. During the conversation at the bar, Meyerson told Mrs. Miceli of a possible transfer of him to Washington, D.C. Before they parted that evening, they agreed to meet for dinner on some subsequent occasion which he would arrange.

Mrs. Miceli testified that her next contact with Meyerson occurred when she received a letter in the mail from him with a printed form. Attached to the form was a "Post-it" note directing her to sign in the place provided. She asked Meyerson whether an attorney should be consulted, but he said that there was no need for one. Meyerson claimed that her signature was just a formality. She testified on cross examination that she did not scrutinize the form or read it completely, but she acknowledged signing the form.

Later, Meyerson called Mrs. Miceli to arrange a dinner date. He asked her to come first to his home at 232 S. Fitzhugh Street at about 6:00 p.m., and he said that they would be going to Peaches Restaurant on the west side of the city. When she arrived at Meyerson's home, a single family two story colonial residence, she entered the house and he fixed her a drink which she consumed while he finished dressing. They then went to Peaches Restaurant on Thurston Road. While in the restaurant, they talked of themselves. Meyerson disclosed, however, that he was obtaining information from Gary King in regard to a possible drug investigation of the defendant. Meyerson told Mrs. Miceli that the government investigation might involve

freezing defendant's assets and that this would enable her to obtain a quicker financial settlement. Mrs. Miceli testified that she told him that evening of defendant's Empire Blvd. business address. She indicated to Meyerson that she did not have keys to the office. According to Mrs. Miceli, Meyerson observed that "there were 'other ways' to get in" and he told her to "get in any way I could." Meyerson told her to "do it" whenever she thought best.

Mrs. Miceli testified that Meyerson asked her whether she would be willing to pay him if they were successful in obtaining a financial settlement from the defendant. Mrs. Miceli testified that Meyerson indicated to her that they "could get married and live happily ever after." She testified that she thought that comment "very odd." She told Meyerson at the time that she was not ready for marriage. Meyerson then asked whether Mrs. Miceli would be willing to visit him once he was settled in Washington, D.C. Mrs. Miceli testified that she responded in the affirmative. When they departed the restaurant, Meyerson drove her to his home, where they made arrangements for a future date. Mrs. Miceli then drove to her home.

Mrs. Miceli testified that she broke into the rear of defendant's business address within a few days after the Peaches Restaurant dinner date. She gained entry through the sliding glass door using a crow bar. The door "popped right open" without breaking the glass. She went to the filing cabinet, and removed a financial folder. She made copies of the folder and then returned it intact. *See* Exhibits # 1–11. The file contained tax returns, financial bank statements, sales contracts closing statements, client statements, and accounts receivable. Mrs. Miceli testified that she took the copies home and waited for Meyerson's call.

When Meyerson telephoned Mrs. Miceli, he asked if she obtained what he needed for his investigation. She replied in the affirmative and, after making arrangements, brought the package to Meyerson's home. Meyerson took the papers upstairs, keeping her waiting for some 15–20 minutes. They then had a drink without discussing the documents. Mrs. Miceli estimated that she was in the home less than an hour.

Mrs. Miceli testified that they met by prearrangement on a third occasion for a "strictly social" meeting. She went to Meyerson's home in her car, arriving some time after 7:00 p.m. They discussed possible visits to Washington, D.C.; Meyerson told her that "things were in the works—a settlement was imminent." She described the discussion as "very social" or "personal" and testified that she was there for more than an hour, drinking beer. She claimed in her testimony that they engaged in sexual intercourse, upon his initiative. Afterwards, Meyerson told her that he would call her and keep in touch. However, that was the last time she saw him at his home. In her testimony, Mrs. Miceli described the room within defendant's home in some substantial detail.

Two weeks later, Mrs. Miceli received a call from Meyerson which she described as a "very cold professional conversation." It appeared from her testimony that there was a burglary at defendant's Empire Blvd. office since their last meeting. Meyerson asked her if she participated in the burglary. She replied that she only knew what she had learned from the media. Two days later, Meyerson called again. Mrs. Miceli testified that she told him that she was considering a reconciliation with her husband. According to Mrs. Miceli, Meyerson was "furious to say the least" and was very upset with her, questioning her sanity and instructing her not to talk of what had transpired between them. Meyerson told her that if any questions came, that she was to say that their contact started only after the robbery of the Empire Blvd. office. Mrs. Miceli testified that that was her last contact with Meyerson.

Thereafter, Mrs. Miceli was contacted by the Internal Revenue Service in regard to an investigation of Meyerson. She agreed to cooperate, and attempted on an unspecified number of occasions to tape conversations with Meyerson. These attempts, however, were not successful.

Defendant presented the testimony of Richard Peritore as corroboration of Mrs. Miceli's account. Peritore was a long time friend of the defendant who received phone calls from the defendant concerning defendant's marital difficulties. Peritore testified that he followed Mrs. Miceli some 5 or 6 times, and that on 3 of those occasions her destination was 232 S. Fitzhugh Street. Peritore testified that the first occasion was in January of 1987, and that on the second and third occasions Mrs. Miceli went into the dwelling. Peritore departed once she entered Meyerson's house, and called the defendant immediately after each visit. Peritore did not observe Meyerson on these surveillances. On cross examination, it was revealed that Peritore had several business dealings with the defendant and, subsequent to the events in question, borrowed substantial sums of money from the defendant which have since been paid.

Defendant also presented the testimony of Donna DeMagistris, who was employed by the defendant between 1985 and 1987. She testified that defendant moved his offices to the Empire Blvd. address in mid–1986. In late 1986 or January of 1987, she arrived at work to discover that the sliding glass door at the rear entrance of the office was unlocked. She examined the lock and found that it did not connect properly. It had not been broken before. She also found footprints in the snow that morning, and asked the defendant why he came into the office through the rear entrance. The defendant replied that he did not enter at the rear. He examined the door, suspecting a theft. When they found everything was in place at the office, they ordered special locks. Defendant did not call the police.

B. *The Government's Version*

Special Agent Donald M. Cerra, currently the Group Manager of the IRS Investigation Division, testified that Meyerson was his former Group Manager during the time period in question. He testified that his first contact with the Miceli investigation involved examination of a "Criminal Investigation Information Item" (Exhibit B) given to him by Meyerson. Meyerson called his attention to it as it was being prepared. He recalled for Meyerson defendant's father's prior IRS investigation and Cerra helped provide the background of certain other names given to Meyerson by Mrs. Miceli.

Cerra testified that he had only one other conversation with Meyerson concerning the Miceli matter, some time in February of 1987, which related to the burglary of defendant's business address. Cerra testified that the IRS file at the time consisted of Exhibits A–E, which comprised Mrs. Miceli's Application for Reward for Original Information (Exhibit A) together with Meyerson's notes of his conversations with Mrs. Miceli (Exhibits B–E). These items were delivered to Cerra for the purpose of review to determine whether criminal violations had occurred. Aside from the tax returns for 1983 and 1985 filed by the defendant, these documents were the only evidence used by Cerra during his review and evaluation of the Miceli file. Cerra testified that prior to finishing his evaluation in August of 1987, in which he recommended that the case be assigned for investigation to Special Agent John Garvin, he did not receive or view any of the exhibits proffered by the defendant as having been taken from defendant's business address by Mrs. Miceli (i.e., Exhibits 1–11). Cerra's last contact with Meyerson occurred on February 27, 1987, the last day Meyerson worked in Rochester.

On cross examination, Cerra acknowledged that he saw Exhibits 1–11 subsequent to assignment of the investigation to Special Agent Garvin. Cerra testified that he saw Exhibits 1–11 when he reviewed the final prosecution report prepared by Special Agent Schirmer; they were in the file at that time and used as exhibits in the final prosecution report.

Special Agent Garvin testified that he was assigned to defendant's case on September 8, 1987. He testified that he filed Exhibits A–E together with some materials sent from the Andover office in the file. He did not obtain Exhibits 1–11 from Meyerson nor did he ever speak with Meyerson

or obtain any information other than by reference to Exhibits A–E. Garvin testified that he was not certain how he obtained copies of Exhibits 1–11, but he thought he might have received some of the documents in question from Jack M. Battaglia, Esq., one of defendant's attorneys.[1] He also testified that he received some of the documents in question from the New York State Tax Department (Exhibit 14 lists the documents received from New York State Tax Department). When he released the file to his next chain in command, Garvin included some of the documents depicted in Exhibits 1–11, but he insisted that he obtained these documents from "third parties only."

Special Agent William R. Schirmer of the IRS Criminal Investigation Division, testified that he received the Miceli file from Special Agent Garvin on May 10, 1988. The file Garvin delivered to Schirmer contained Exhibits A–E, and did not, according to Schirmer, contain any other documents. Contrary to Garvin's testimony that he included copies of Exhibits 1–11 in the file when he turned it over to Schirmer, Schirmer testified that there were no documents other than Exhibits A–E in the file when it was presented to him. Schirmer had no substantive conversations with Meyerson about the investigation.

Meyerson testified that he first met Mrs. Miceli on January 9, 1987, at a 4:00 p.m. meeting in the office of the Criminal Investigation Division of the IRS. Mrs. Miceli had previously contacted Meyerson by telephone to set up the appointment. Meyerson testified that Nancy King had also previously told him that Mrs. Miceli wished to talk with him concerning her tax situation. Meyerson conceded that the IRS had no interest in the defendant prior to his contact with defendant's wife.

Meyerson denied that a tape recorder was used during his interview of Mrs. Miceli on January 9th. The interview lasted 2 hours or longer, after which, Meyerson conceded, they went to the State Street Bar for drinks. Meyerson testified that they proceeded to the bar at his suggestion because they were exhausted and they needed more relaxed surroundings. They spent about one hour at the State Street Bar. Meyerson testified that he prepared a Criminal Investigation Information Item (Exhibit B) which he forwarded to the Andover Service Center for comparison with defendant's tax returns.

According to Meyerson, he next saw Mrs. Miceli in his house at 232 S. Fitzhugh Street before proceeding to dinner at Peaches Restaurant on January 20, 1987. Meyerson acknowledged that she was within his home for a time before they left for the restaurant. At the restaurant, according to Meyerson, they discussed the investigation of the defendant; she asked what would happen with the IRS inquiry. Meyerson explained that his contacts with Mrs. Miceli, who he described as an "informant," were for the purpose of developing further facts from which he might prepare an application for a search warrant. Meyerson denied that he ever suggested a break-in of defendant's offices, denied that he suggested that anything he might do would help Mrs. Miceli obtain a favorable financial settlement in a divorce proceeding, denied that he ever suggested that they might be married, and denied that he had any conversation with her concerning drug trafficking or the freezing of defendant's assets.[2] He testified that the Peaches Restaurant meeting occurred on January 20, 1987.

In his testimony, Meyerson did not recall ever personally meeting with Mrs. Miceli again after the January 20th dinner date. He testified that he never had any sexual intimacy with her, and that he never received any documents from her, except Exhibit A—the Claim for Reward Form.

---

1. The inability of the government to present testimony which explained in concrete fashion how the documents found their way into the IRS investigation file is curious, notwithstanding that the testifying agents insisted that they were obtained from third parties.

2. Meyerson made it to clear to her on January 9th, however, that there was a procedure available to her to collect some reward for giving information, and he had specific reference to the claim for reward form (Exhibit A).

Meyerson and Mrs. Miceli had a telephone conversation on February 10th, however, in which, according to Meyerson, she imparted several other details concerning defendant's financial condition (see Exhibit D). Meyerson testified that the conversation was not otherwise remarkable, and that he had no further contact from her after February 10th.

Meyerson testified that he also spoke with probation officer Gary King on January 16, 1987, when King contacted him. King and Meyerson were professionally and socially associated. Gary King's wife, Nancy King, was the secretary to the United States Marshal, a close, personal and professional friend of Meyerson. King volunteered considerable information concerning defendant's personal habits and marital difficulties.

On cross examination, Meyerson testified that he did not think that a dinner engagement with a female informant violated IRS regulations or guidelines. He added that he had taken other female informants out to dinner on previous occasions, although it was unusual for him to encounter an informant who was also the wife of the targeted suspect. Indeed, he testified that he didn't remember taking a target's wife to dinner before. Meyerson submitted a voucher for both the State Street Bar cocktails, and the Peaches Restaurant dinner (in the amounts of $15.47 and $33.00, respectively). He described his conduct as "cultivat[ing] the informant."

Meyerson acknowledged on cross examination that he supposed that the Kings had informed Mrs. Miceli that he was not married. He admitted that his conversation with Mrs. Miceli was not limited to defendant's tax situation; they discussed her divorce and the highly emotional experience divorce proceedings entailed. He did not advise her that she was an informant, and he described their "sessions ... [as] far more subtle." Meyerson did not remember in his testimony that he had specifically told Mrs. Miceli not to use illegal means to obtain information against her

husband but he supposed that he did so inform her because the IRS manual requires such an advisement. In any event, he denied receiving Exhibits 1–11 from her. Meyerson testified that she never indicated to him that she thought they had anything but a professional relationship. Meyerson did not introduce her to any other agent, as might be required under IRS guidelines if he intended to use her as a "controlled informant." But Meyerson's testimony did not reveal that he ever requested of her that she obtain additional information against the defendant that was not volunteered during their various conversations.

There was no written record of the Peaches Restaurant dinner conversation. Cerra testified that a "Memorandum of Contact" is normally prepared after each contact with an informant, or that at least an entry would be made in the agent's diary. He testified that it would be "unusual" for someone to have significant contact with a person such as Mrs. Miceli and not make a Memorandum of Contact.[3] Cerra also testified that it was not in keeping with good judgment and care for an agent to take the wife of an investigation target to dinner. Cerra believed that, in both his professional and personal view, and in his capacity as a supervisor, such an encounter would not be expected of his subordinates. Cerra indicated that he had never invited informants home for dinner or for drinks, and that even if the IRS Manual might permit it, he would not consider it good judgment. He testified further that, if Meyerson had indeed in any way indicated to Mrs. Miceli that she should get additional information against the defendant, IRS Guidelines required that he open a "control file" in regard to her and obtain District Director approval of his investigative procedure.

Meyerson's testimony was marred by a particularly troublesome incident. The parties previously agreed to a sequestration order with respect to witnesses who might testify at the hearing. Unbeknownst to

---

**3.** On the other hand, the submission of the voucher negates any claim that Meyerson intended to conceal the nature of his contact with Mrs. Miceli on January 20th.

the court and counsel to the parties, Meyerson's fiancee, Zoe Aquilla, sat through the testimony of each defense witness. She went to lunch with Meyerson prior to Meyerson's testimony. When confronted after the noon break with what might appear to be a violation, in spirit at least, of the sequestration order, Ms. Aquilla was called to testify. She acknowledged being present in the courtroom during the testimony of the defendant's witnesses, and she acknowledged answering in response to defendant's question at lunch whether their testimony was "believable." She informed Meyerson of the identity of the witnesses who testified, but she maintained that she refused to reveal to him whether she thought that they were "believable."

Meyerson would not acknowledge in his testimony that the exchange amounted even to that much. At first, he stated that he had a "momentary lapse in memory" concerning his luncheon conversation with Ms. Aquilla. Later, he testified that he only inquired of Aquilla who were in the courtroom that morning. The very presence of Aquilla in the courtroom, despite Meyerson's prior knowledge of the sequestration order, together with his refusal to acknowledge the full extent of the limited luncheon conversation described by Aquilla in response to the court's questions, casts some considerable doubt upon the credibility of Meyerson's testimony.[4]

Fortunately, however, the court need not resolve the bulk of this difficult credibility issue. With respect to the Fourth Amendment claims, the credible testimony shows no official search of defendant's offices. With respect to the due process and supervisory power claims, defendant is not entitled to relief even on his version of the facts. An explanation of the Fourth Amendment issue, the due process issue, and the supervisory power issue follows:

### C. The Fourth Amendment Claim

■ If Meyerson had done what Mrs. Miceli claimed to have done at defendant's Empire Blvd. business address, his conduct would have amounted to an unconstitutional warrantless search. Defendant unquestionably had a legitimate privacy expectation in his offices. *United States v. Chuang*, 897 F.2d 646, 649–50 (2d Cir. 1990). On the other hand, the Fourth Amendment does not reach private searches. If Mrs. Miceli had, "wholly on her own initiative, sought out her husband's ... [financial documents] and then taken them to the police station to be used as evidence against him, there can be no doubt under existing law that the articles would later have been admissible in evidence." *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971). *See Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). In *Coolidge*, the court found "not the slightest implication of an attempt on their part [i.e., the police] to coerce or dominate her [i.e., the wife], or, for that matter, to direct her actions by the more subtle techniques of suggestion that are available to officials in circumstances like these." *Coolidge v. New Hampshire*, 403 U.S. at 489, 91 S.Ct. at 2049.

Because this case does not involve any coercion or domination of Mrs. Miceli at or prior to the Peaches Restaurant dinner conversation, the success of defendant's claim depends upon the credibility of the testimony. I am satisfied of Meyerson's testimony that he did not importune Mrs. Miceli's supposed burglary of defendant's offices. Although the testimony did not completely establish how Exhibits 1–11 became a part of the IRS investigative file, the testimony of each Special Agent connected with the investigation was uncontradicted, establishing that the documents were not a part of the file until well after Meyerson's departure from Rochester. Meyerson thus having not encouraged or otherwise instigated the burglary of defendant's premises, and the government not otherwise having taken any part in a wrongful procurement of the exhibits, "there is no reason why ... [the government cannot] use them." *United*

---

4. I have completely disregarded Ms. Aquilla's volunteered and transparent attempt to vouch for Meyerson's credibility. As might understandably be expected of someone newly affianced, she affirmed complete confidence in Meyerson's honesty and ethics.

*States v. Bennett,* 729 F.2d 923, 924 (2d Cir.1984). *See also, United States v. Bennett,* 709 F.2d 803, 805–06 (2d Cir.1983); *United States v. Gambino,* 734 F.Supp. 1084, 1090–91 (S.D.N.Y.1990).

### D. *The Due Process Outrageous Governmental Conduct Claim*

In *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court observed that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* 411 U.S. at 431–32, 93 S.Ct. at 1642. Subsequently, in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Court, in a plurality opinion by the writer of the *Russell* opinion (Rehnquist, J.), rejected a due process "outrageousness" defense for any defendant found predisposed to commit the crime charged, on separation of powers grounds. The plurality did not opine on the viability of the *Russell* dictum in cases not involving a predisposed defendant. As characterized by Justice Powell, "[t]he plurality thus says that the concept of fundamental fairness inherent in the guarantee of due process would never prevent the conviction of a predisposed defendant, regardless of the outrageousness of police behavior in light of the surrounding circumstances." *Id.* 425 U.S. at 492, 96 S.Ct. at 1651 (Powell, J., concurring).

The plurality opinion would relegate those seeking a remedy for outrageous police conduct in cases of a predisposed defendant to the executive branches of government, which may prosecute or discipline government agents. *Id.* 425 U.S. at 490–91, 96 S.Ct. at 1649–50. The concurring and dissenting members of the Court, however, provided a five justice majority which rejected that view and held that the due process outrageousness defense may be available in an extreme enough case, even to a defendant found predisposed to commit the crime charged. *Id.* 425 U.S. at 495–500, 96 S.Ct. at 1652–55 (Brennan, J., dissenting). As the concurring opinion ob-

served, however, the Supreme Court has not "had occasion yet to confront Government over-involvement in areas outside the realm of contraband offenses." *Id.* 425 U.S. at 493, 96 S.Ct. at 1652 (citing *United States v. Archer,* 486 F.2d 670 (2d Cir. 1973)).

Application of these principles to a non-contraband context, as is clearly involved in this tax prosecution, is not an easy task. The contexts in which the due process defense has received regular treatment are in the so-called sting operations. *See e.g., United States v. Moore,* 916 F.2d 1131 (6th Cir. October 26, 1990) (upheld government mail order business in child pornography); *United States v. Jacobsen,* 916 F.2d 467 (8th Cir.1990) (same); *United States v. Asencio,* 873 F.2d 639, 640–41 (2d Cir.1989) (undercover sale of large quantities of narcotics upheld, but leaving open whether such an operation involving user quantities only would be upheld); *United States v. Zambrano,* 776 F.2d 1091, 1098–99 (2d Cir. 1985) (government complicity in counterfeit credit card operation); *United States v. Alexandro,* 675 F.2d 34, 39–40 (2d Cir. 1982), *cert. denied,* 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982) (ABSCAM). Although there may be persuasive reasons to reject a due process defense *per se* on separation of powers grounds, *see United States v. Miller,* 891 F.2d 1265, 1271–73 (7th Cir.1989) (Easterbrook, J., concurring) (observing that police-investigative tactics pose a "political problem" only, and that "[w]e deem it enough to support punishment that this person committed this offense, leaving to other institutions the redirection of investigative or prosecutorial resources"), the Second Circuit recognizes that outrageous governmental investigative conduct may in an extreme case require invalidation of a conviction on due process grounds.

> We recognize that there are circumstances where government conduct in its investigation of a crime may be so outrageous as to require reversal of a conviction. *Hampton v. United States,* 425 U.S. 484, 491–95 [96 S.Ct. 1646, 1650–53, 48 L.Ed.2d 113] (1976) (Powell, J., concur-

ring); *United States v. Alexandro,* 675 F.2d 34, 39–40 (2d Cir.1982); *Archer v. Commissioner of Correction,* 646 F.2d 44, 46–47 (2d Cir.), *cert. denied,* 454 U.S. 851, 102 S.Ct. 291, 70 L.Ed.2d 141 (1981); *United States v. Nunez–Rios,* 622 F.2d 1093, 1097–98 (2d Cir.1980). To violate a defendant's due process rights, government conduct must be "most egregious and [reach] the level of shocking the conscience." *Alexandro,* 675 F.2d at 40. Only rarely will such a claim be sustained. *See United States v. Roland,* 748 F.2d 1321, 1326 (2d Cir.1984); *United States v. Duggan,* 743 F.2d 59, 84–85 (2d Cir.1984).

*United States v. Zambrano,* 776 F.2d at 1098. *United States v. Asencio,* 873 F.2d at 640–41 (police tactics "would have to reach a demonstrable level of outrageousness before it could bar conviction") (quoting *Hampton v. United States,* 425 U.S. at 495 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring)). "[A]s we recently observed in *United States v. Alexandro,* 675 F.2d 34 (2d Cir.1982), ... the due process claim, in the rare instances when successful, has prevailed to restrain law enforcement activities that involve coercion, *e.g., Watts v. Indiana,* 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949), or outrageous violation of physical integrity, *e.g., Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)." *United States v. Myers,* 692 F.2d 823, 837 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983).

■ In this case, it is clear that Meyerson did not, even on a view of the facts most favorable to defendant, involve himself in the conduct which is the subject of this prosecution. Indeed, Meyerson never dealt with or confronted the defendant. His sole contact was with defendant's wife, who at the time was estranged from her husband. With the exception of the claimed search of defendant's offices (see below), virtually all of Meyerson's alleged conduct was directed toward, and exclusively concerned, Mrs. Miceli. This fact is fatal to defendant's claim. As made clear by a majority of the Supreme Court in

*United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980)), "even if we assume ... [a due process outrageousness defense], the fact remains that '[t]he limitations of the Due Process Clause ... come into play only when the Government activity in question violates some protected right of the *defendant.*'" *Id.* 447 U.S. at 737 n. 9, 100 S.Ct. at 2447 n. 9 (emphasis in original) (quoting the plurality opinion in *Hampton v. United States,* 425 U.S. at 490, 96 S.Ct. at 1649). The dissent in *Payner* viewed the majority as establishing a "standing" rule denying the due process defense to those not an "immediate victim of the Government's outrageous conduct." *Id.* 447 U.S. at 749 n. 15, 100 S.Ct. at 2453 n. 15 (Marshall, J., dissenting). This is a fair reading of the above quoted language. *Compare, United States v. Calderone,* 917 F.2d 717, 724 (2d Cir.1990) (Newman, J., concurring) (declining to adopt the dissenters' characterization of the majority opinion in *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) because the majority itself had not explicitly adopted that characterization). Although the Second Circuit reserved decision of the issue in a pre–*Payner* decision, it observed that, "in all these cases, ..., the impermissible police conduct was inflicted directly upon the *defendant.*" *Archer v. Commissioner of Correction of the State of New York,* 646 F.2d 44, 47 (2d Cir.1981) (emphasis supplied). The standing issue left open in *Archer* is now foreclosed by *Payner* and it applies in this case to defeat defendant's due process defense insofar as it concerns Meyerson's conduct toward Mrs. Miceli. Meyerson's activities did not involve coercion or outrageous violation of physical integrity of the defendant. To be sure, "[i]t would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums." *United States v. Archer,* 486 F.2d at 676–77. On such a rationale, the court would not hesitate to intervene if Meyerson had raped or otherwise abused Mrs. Miceli in a single-minded effort to collect evidence of crime against the defendant. But that did not occur in this case,

even though violations of IRS Guidelines and ill-advised and welcome sexual conduct may have occurred.[5]

■ Even if the defendant had standing, existing case law interpreting the due process outrageousness defense shows that he would not be entitled to relief. In virtually all of the reported cases, an informer's cultivation of a sexual relationship with the defendant to facilitate investigation or the commission of criminal conduct has not provided a basis for dismissal of the indictment or suppression of the evidence gathered. *United States v. Fadel*, 844 F.2d 1425, 1429 (10th Cir.1988) (describing district court holding denying relief to a defendant befriended by governmental informant who became sexually intimate with defendant and who repeatedly solicited defendant's financing of cocaine purchases); *United States v. Simpson*, 813 F.2d 1462, 1465–68 (9th Cir.1987) (same), *cert. denied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987); *United States v. Shoffner*, 826 F.2d 619, 625–26 (7th Cir.1987), *cert. denied sub nom. Stange v. United States*, 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987); *United States v. Marion S. Barry, Jr.*, unpublished Memorandum and Order (D.D.C. May 25, 1990) (Jackson, J.) ("[D]ue process guarantees are violated only in the narrow category of cases where the challenged conduct includes 'coercion, violence, or brutality to the person.'") (quoting *United States v. Jenrette*, 744 F.2d 817, 824 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985). *Cf. United States v. Romo*, 914 F.2d 889, 895 (7th Cir.1990); *United States v. Miller*, 891 F.2d at 1268; *United States v. Slaughter*, 891 F.2d 691, 696 (9th Cir.1989). These

cases usually involve informants, not sexual activity concerning law enforcement agents themselves. *See e.g., United States v. Simpson*, 813 F.2d at 1468 n. 4 (leaving issue open but noting state court opinions sanctioning the practice). But in each the sexual activity was directed at the defendant, not someone else and yet reversal was not required.

In this case, the claimed sexual intimacy occurred after the alleged procurement of evidence and appears, from Mrs. Miceli's account, to have been welcome. Furthermore, it was not connected with Meyerson's, or the government's, procurement of additional information against defendant. In the sexual intimacy cases cited above, the sexual or personal relationship involving a government informant and the defendant provided the setting for the actual commission of the crime, for the most part narcotics procurement or sales. Yet the convictions were upheld. In this case, the tax crime, if any (defendant is presumed innocent), had already occurred and was wholly distinct, both spatially and temporally, from the claimed sexual relationship. No coercion may be said to have induced or provoked defendant's alleged treatment of his tax obligations.

Similarly, simply taking Mrs. Miceli to drinking and eating establishments, whether or not condoned by IRS Guidelines or commonly accepted investigative behavior, does not provide a ground for dismissal or suppression of evidence independent of the Fourth Amendment guarantee delineated above. Meyerson did not attempt to hide these occurrences, as he concededly submitted a voucher for each encounter and presumably submitted enough information

---

5. The due process clause would not reach Meyerson's alleged conversation with Mrs. Miceli in Peaches Restaurant in which he was reported to have said, "Get it anyway you can," because, as shown above, the Fourth Amendment fully reaches such conduct and it provides an adequate suppression remedy. Thus, if Meyerson had indeed told her to burglarize defendant's offices, contrary to my findings above, defendant's remedy would lie in established Fourth Amendment doctrine, which involves the constitutional provision specifically directed to such conduct, not the Fifth Amendment's due process clause. *Cf. Graham v. Connor*, 490 U.S. 386,

109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (applying the Fourth Amendment, exclusively, in § 1983 precustodial excessive force claims "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against" unreasonable searches and seizures, "not the more generalized notion of 'substantive due process,' ...") Just as the court's supervisory power may not be "use[d] as a substitute for established Fourth Amendment doctrine," *United States v. Payner*, 447 U.S. at 736 n. 8, 100 S.Ct. at 2446 n. 8 (*see* discussion, below), the due process clause may not be employed as a similar substitute.

to auditors to obtain reimbursement. Although defense counsel introduced the subject of the vouchers on cross-examination, no effort was made to show that Meyerson lied in his voucher affirmations. The two "dates," even when considered with the alleged subsequent sexual encounter, did not involve "coercion" or "reach a demonstrable level of outrageousness" even if it does violate IRS Guidelines. *Hampton v. United States*, 425 U.S. at 495 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring). Indeed, there was much in Mrs. Miceli's testimony from which it could be fairly concluded that the exchanges with Meyerson furthered her dominant purpose at the time of securing the means by which to obtain a favorable divorce settlement from her husband.

None of this should be taken to condone the behavior testified to by Mrs. Miceli. If her account is true, strong administrative measures may be in order. Meyerson's conduct would surely have violated the Guidelines, and would have involved the invocation of his public position and trust for private benefit. There is something particularly unsavory in the use of public position, with all the trappings of official power, to seduce informers during the course of an investigation, even if the investigation is genuine and not a sham created to induce the relationship. In the absence, however, of an account of the protagonists' dealings which provides due process relief according to the standard articulated above, it would be inappropriate to make the unnecessary credibility finding which will doubtless be required in the pending disciplinary proceeding against Meyerson. This court's duty is to adjudicate defendant's due process rights in the context of a criminal action, and a view of the evidence presented at the hearing most favorable to defendant does not afford him relief, even accepting the vitality of the outrageous governmental conduct defense.

### E. *The Supervisory Power Claim*

Defendant asks the court to invoke its supervisory powers to dismiss the indictment or suppress evidence allegedly taken from defendant's offices. As with the due process claim, defendant's account of the pertinent events, as testified to by Mrs. Miceli, is assumed to be true without a formal credibility finding, because on either version of the facts, defendant would not be entitled to supervisory power relief.

In *Hampton v. United States, supra,* a plurality of the Supreme Court implicitly rejected a supervisory power defense based on outrageous governmental conduct. *Id.* 425 U.S. at 490, 96 S.Ct. at 1649. The concurring opinion did not "foreclose reliance on our supervisory power to bar conviction . . . because of outrageous police conduct." *Id.* 425 U.S. at 493–94, 96 S.Ct. at 1652 (Powell, J., concurring). The dissenting justices fully embraced a supervisory power defense to a criminal prosecution. *Id.* 425 U.S. at 500 n. 4, 96 S.Ct. at 1655 n. 4 (Brennan, J., dissenting). In *United States v. Payner, supra,* a majority of the Court fully rejected a supervisory power ground for suppressing evidence taken "unlawfully from a third party not before the court." *Id.* 447 U.S. at 735, 100 S.Ct. at 2446. On the other hand, although calling for a "restrained application of supervisory power," *id.* 447 U.S. at 735, 100 S.Ct. at 2446, and imploring its exercise "with some caution," *id.* 447 U.S. at 734–35, 100 S.Ct. at 2445, the majority reaffirmed that "[f]ederal courts may use their supervisory power in some circumstances to exclude evidence taken from the *defendant* by 'willful disobedience of law.'" *Id.* 447 U.S. at 435 n. 7, 100 S.Ct. at 2446 n. 7 (emphasis in original) (quoting *McNabb v. United States,* 318 U.S. 332, 345, 63 S.Ct. 608, 615, 87 L.Ed. 819 (1943)). Because it is claimed that defendant's offices were the subject of a government importuned burglary by defendant's wife, defendant seeks to take advantage of what *Payner* left intact of the supervisory power doctrine.

An analysis of the doctrine as applied in this circuit since *Hampton* and *Payner* does not suggest a ready answer to the problem posed in this case. "Whatever the scope of that authority [i.e., supervisory power] in the aftermath of *United States v. Payner,* . . . it does not permit courts to

fashion their own 'sub-constitutional' limitations on the conduct of law enforcement agents." *United States v. Myers*, 692 F.2d at 847 (adding that "its scope is surely not to be expanded" and that defendants' "are entitled to no more from the courts than a testing of Abscam against constitutional standards"). In *Daye v. Attorney General of the State of New York*, 712 F.2d 1566 (2d Cir.1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984), the Second Circuit interpreted *Payner* to hold "that separation-of-power considerations limited the federal judiciary's supervisory powers over investigative and prosecutorial activities that take place outside the courthouse." *Id.* 712 F.2d at 1570 n. 2 (acknowledging, however, "that federal courts retain supervisory powers over in-court activities"). A month later, the Second Circuit observed, "Recent cases in the Supreme Court and this Circuit have established that the federal judiciary's supervisory powers over prosecutorial activities that take place outside the courthouse is extremely limited, *if it exists at all*." *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir.1983) (emphasis supplied), *cert. denied*, 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 322 (1983). The court left open, however, an avenue "for the exercise of such power." *Id.* A similar cautionary note based on separation of powers principles was contained in *In Re N.D.N.Y. Grand Jury Subpoena #86–0351–S*, 811 F.2d 114, 118 (2d Cir.1987) ("despite our distaste for its tactics here, we do not attempt to control the executive branch's behavior").

In *United States v. Hammad*, 858 F.2d 834 (2d Cir.1988), however, the Second Circuit found supervisory authority to suppress evidence obtained outside the courthouse by the government's illegal issuance of a "sham subpoena" for an informant which provided the opportunity for contact with a represented suspect in violation of DR 7–104(A)(1) of the Code of Professional Responsibility. The provision of a supervisory power remedy, however, concerned only that evidence procured as a result of the government's illegal issuance of the subpoena, and its concomitant violation of

DR 7–107(A)(1) to the prejudice of the defendant. Significantly, the provision of a remedy in the exercise of the court's supervisory power was necessary to the court's decision because no constitutional, statutory, or ethical rule explicitly provided for exclusion in the circumstances and prejudice would otherwise result without exclusion. *Id.* 858 F.2d at 840–42. Equally significant, however, the court did not suggest, perhaps partly because the defendant did not argue, that a remedy of dismissal would be appropriate. Rather, the suppression remedy fashioned by the court in its supervisory power concerned only what was necessary to remedy the prejudice to the defendant directly caused by the government's misconduct.

Although not stated by the *Hammad* court in quite this way, the disposition of the case accords with the Supreme Court's recent admonitions that the exercise of the supervisory power must concern real prejudice to the defendant, and that it not be a naked exercise in supervision over executive branch officials. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988) ("a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant"); *United States v. Hastings*, 461 U.S. 499, 506–07, 103 S.Ct. 1974, 1978–79, 76 L.Ed.2d 96 (1983) (supervisory power remedies may not be employed to avoid harmless error analysis and must be "narrowly tailored"); *United States v. Williams*, 874 F.2d 968, 976 n. 23 (5th Cir.1989) (*Payner, Hastings*, and *Bank of Nova Scotia* "counsel against use of the supervisory power to control executive conduct rather than to redress cognizable prejudice to a defendant"). The remedy of dismissal of an indictment may only be employed to remedy real prejudice to a defendant which may not be remedied by a more narrowly drawn remedy. *United States v. Mendez–Hernandez*, unpublished No. S 89 Crim. 323 SWK (S.D.N.Y. May 7, 1990) (WESTLAW 1990 WL 64600). On the other hand, the *Hammad* decision shows the Second Circuit's willingness to fashion an exclusionary remedy if no other

constitutional or statutory remedy is available. *Cf. United States v. Perez,* 904 F.2d 142, 148 (2d Cir.1990) (reaffirming "the legitimacy of a federal court's supervisory power, and its role in securing rights not guaranteed by the Constitution").

In this case, the Fourth Amendment provides an exclusionary remedy for governmental participation in an otherwise private search which would, if conducted by government agents alone, violate the Fourth Amendment (*see* Part C, above). As emphasized in *Payner,* the supervisory power doctrine may not be "use[d] as a substitute for established Fourth Amendment doctrine." *United States v. Payner,* 447 U.S. at 735 n. 8, 100 S.Ct. at 2446 n. 8. Therefore, consistent with the analysis above, there would be no need for devising a supervisory power remedy to "secure rights" which are "guaranteed by the Constitution." *United States v. Perez,* 904 F.2d at 148; *United States v. Hammad,* 858 F.2d at 840–41. In this case, however, defendant's Fourth Amendment rights have not been violated. *See* Part C, above.

But even if the Fourth Amendment did not provide a suppression remedy in the circumstances, and I had resolved all credibility issues in favor of Mrs. Miceli, defendant cannot show on this record that Meyerson's conduct prejudiced him such that an exclusion order in the court's supervisory power should issue. The items allegedly taken from defendants' offices would have been inevitably discovered by use of the many and expansive IRS investigative powers in any event, particularly in view of information given by Mrs. Miceli to Meyerson before any untoward conduct occurred.[6] Indeed, many of Exhibits 1–11, which included 1984–85 tax returns, the Woody View Closing Statements, the S & P Sales Contract, and three Central Trust bank statements, as defendant describes them in his papers, are readily procurable

from a number of different sources in a regularly conducted and typical IRS investigation. As one of the agents subsequently assigned to the case testified, the documents in question were thought to have been turned over to the IRS by defense counsel. As the government contends, the testimony was uncontradicted that the file did not contain documents until well after Meyerson had left Rochester and became unconnected with the investigation. In short there is no proof that defendant was prejudiced by Meyerson's conduct, and therefore there is no occasion for the use of the court's supervisory authority. Providing a remedy in the exercise of supervisory power would, in those circumstances, be a naked exercise in control of Executive Branch activities outside the courthouse.

## CONCLUSION

The foregoing constitutes my Report and Recommendation that the motions for dismissal and for suppression be denied as set forth above.

The parties should be on notice that, pursuant to 28 U.S.C. § 636(b)(1)(C) and Local Rule 37(A)(3), any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt thereof. Failure to file objections within the specified time waives the right to appeal a District Court Order adopting this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(b) and 6(c); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

---

**6.** There would be no basis to suppress Exhibits A–C at the hearing, which are Meyerson's notes of conversations had with Mrs. Miceli before

the alleged sexual advances and, indeed, before the Peaches Restaurant conversation after which it is contended that a burglary occurred.